IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 17, 2018

**STATE OF TENNESSEE v. PERRY LEWIS SISCO**

**Appeal from the Criminal Court for Putnam County**
**No. 14-CR-843        David A. Patterson, Judge**

_____

**No. M2017-01202-CCA-R3-CD**

_____

Perry Lewis Sisco, the Defendant, was convicted by a jury of one count of rape of a child and four counts of rape and was sentenced to twenty-five years for rape of a child and to twelve years on each of the rape convictions. The four twelve-year sentences were ordered to be served concurrently with each other but consecutively to the twenty-five-year sentence, for a total effective sentence of thirty-seven years. On appeal, the Defendant claims that: (1) the trial court erred in denying the motion to suppress his statement; (2) the trial court erred in denying his motion for the recusal[1] of the 13th Judicial District Attorney General and his staff; (3) the trial court abused its discretion in sentencing; and (4) there was insufficient evidence to sustain the convictions. Discerning no error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and TIMOTHY L. EASTER, J., joined

Craig P. Fickling, District Public Defender: L. Scott Grissom and Jennifer Kolstadt, Assistant Public Defenders, Cookeville, Tennessee, for the appellant, Perry Lewis Sisco.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Counsel; Bryant C. Dunaway, District Attorney General; and Beth Willis and Bret T. Gunn, Assistant District Attorney General, for the appellee, State of Tennessee.

---

[1] Although characterized as a motion for recusal, we will address the motion as one for disqualification of the district attorney general's office.

**OPINION**

**Factual and Procedural Background**

On August 11, 2014, one day before her sixteenth birthday, K.S.[2] disclosed to an assistant principal at Cookeville High School that her father had been molesting her since she was eight years old and that her mother was aware of the molestation and did nothing to prevent it.

On October 6, 2014, a Putnam County grand jury issued a ten-count indictment charging the Defendant with three counts of rape of a child (Counts 1, 2, and 3) and seven counts of rape and jointly charging Kathy Ann Sisco ("K.S.'s mother") with rape in Counts 5, 6, 7, and 8. On May 6, 2016, a grand jury issued a superseding ten-count indictment. Other than the date of issuance, the only differences between the original indictment and the superseding indictment were that K.S.'s mother was charged with rape in Counts 5, 6, and 7 in the superseding indictment and the dates between which the offenses were alleged to have occurred. The superseding indictment for Counts 1, 2, and 3 alleged that "between August 12, 2006, through August 11, 2011," the Defendant "did unlawfully and intentionally or knowingly sexually penetrate [K.S.] . . . a person less than thirteen (13) years of age, in violation of T.C.A. § 39-13-522[.]" For Counts 4, 5, and 6, the superseding indictment alleged that "between August 12, 2011, through August 11, 2013," the Defendant "did intentionally and knowingly by force or coercion sexually penetrate [K.S.] in violation of T.C.A. § 39-13-503[.]" For Counts 7, 8, 9, and 10, the superseding indictment alleged that "between August 12, 2013, through August 31, 2014," the Defendant "did intentionally, knowingly, or recklessly sexually penetrate [K.S.], without her consent and the [D]efendant . . . , knew or had reason to know that [K.S.], did not consent to said sexual penetration, in violation of T.C.A. § 39-13-503[.]"[3]

The Defendant filed a motion to sever his case from his wife's case, a motion to suppress his statement, a motion for bond reduction, a motion for *in camera* inspection of the record of the Department of Children's Services (DCS), and a motion for the District Attorney General's (D.A.'s) Office to be removed from the prosecution of the case.

---

[2] It is the policy of this court to refer to minor victims by their initials only.

[3] Another superseding indictment is included in the record. This indictment appears to have been prepared in regards to the State's election of offenses announced at the conclusion of the State's proof. This indictment is identical to the prior superseding indictment for Count 1. Counts 2, 3, 8, 9, and 10 are omitted. Counts 4, 5, 6, and 7 are renumbered as Counts 2, 3, 4, and 5 respectively. An Order of Nolle Prosequi of Counts 2, 3, 8, 9, and 10 was entered on December 1, 2016. This indictment contains a clerical error in that the case number is shown as 2016-CR-843, rather than 2014-CR-843.

At the beginning of the hearing, the trial court granted the motion for severance and allowed the Defendant and the State full access to the DCS records. Investigator Terry Hembree of the D.A.'s Office testified that he met Putnam County Sheriff's Department (PCSD) Detective Roger Cooper at Cookeville High School at approximately 6:00 p.m. on August 11, 2014.[4] The Defendant and K.S.'s mother were already at the school when Investigator Hembree arrived. The Defendant agreed to go with him to the D.A.'s Office for an interview. Investigator Hembree explained that he wanted to conduct the interview at the D.A.'s Office because the office had an interview room equipped for audio and video recording. Investigator Hembree advised the Defendant that he was not under arrest, and he did not handcuff the Defendant. The Defendant agreed to ride in a patrol car to the D.A.'s Office.

Investigator Hembree began the interview at approximately 8:00 p.m. by obtaining the Defendant's oral consent to be interviewed. The digital video disc (DVD) of the interview was entered as Exhibit 2 to the motion hearing. Investigator Hembree then read aloud the "Advice of Rights/Waiver of Rights" form, and the Defendant executed a written waiver of his *Miranda* rights. According to Investigator Hembree, the Defendant admitted that he had sexual contact with K.S. when she was approximately thirteen years of age and that he had "penile/vaginal penetration and oral sex between the two of them" approximately twenty times. On cross-examination, Investigator Hembree agreed that the Defendant and K.S.'s mother went to the school to look for their daughter after she did not return home and that they had been at the school for approximately three hours when he arrived.

The following dialogue from the direct examination of the Defendant's mother, Barbara Sisco, was the only proof offered by the Defendant on the motion to disqualify the D.A. and his staff:

> [Trial Counsel:] And are you familiar, w[ith] Mr. E.J. Mackie, did he at one point in time represent [the Defendant] in a matter in Cumberland County?
>
> [Barbara Sisco:] I think so.

---

[4] By the time of the motion hearing and at trial, Investigator Hembree was employed by the PCSD as a Major over the detective division. For consistency, we will refer to him as Investigator Hembree, the position he held when he investigated the case.

[Trial Counsel]: So you were familiar that, with regarding something in DCS, regarding a different daughter of [the Defendant]?

[Barbara Sisco:] Yes, I just, I don't remember that much about the case.

[Trial Counsel]: But you do believe he retained Mr. E.J. Mackie?

[Barbara Sisco:] Yes.

At the conclusion of the hearing, the following dialogue occurred:

[Trial Court:] Now[,] I don't know of anything that causes me to think that the [S]tate should be recused from the case. I didn't hear definitively that the [D]efendant was represented by E.J. Mackie and I don't know how the [S]tate would have difficulty if E.J. Mackie had been retained in a case having to do with child support or some civil action, was it, [trial counsel]? Is that what you heard?

[Trial Counsel:] Your Honor, it was something regarding a DCS matter.

[Trial Court:] So what is the argument then that the [S]tate's attorney should be removed from this case?

[Trial Counsel:] Your Honor, [the Defendant] requested I file this motion. He does not---

[Trial Court:] Okay. What is the thought process behind it? I understand that he's asking you to, where are we?

[Trial Counsel:] Your Honor, [the Defendant] just didn't feel that since Mr. Mackie had been his attorney that he would have, that their office would have access to maybe information that he had shared with Mr. Mackie previously and that he didn't feel comfortable with this particular District Attorney's Office prosecuting this matter since Mr. Mackie has been hired onto their staff.

[Trial Court:] Okay. Now I see what you're saying.

[Trial Counsel:] Yes.

- 4 -

[Trial Court:]  All right.  We had to make that connection.  General, do you see any difficulty?

[State:]  No, sir, I've had no connection, no conversation with Mr. Mackie about this case.

[Trial Court:]  And do you plan to do that?

[State:]  No.

[Trial Court:]  And can you keep from having any conversation with him that would have to do with anything that he would know with [the Defendant]?

[State:]  Yes, sir.  I rarely ever see Mr. Mackie.

[Trial Court:]  Okay.  You've had none with him on this case, [Mr.] Mackie has had nothing to do to touch the case?

[State:]  And General Gunn, who will be trying the case, has not either.

[Trial Court:]  Okay.  At this time I see no reason for the [S]tate to be recused from hearing the case, the [S]tate's attorneys in the 13th Judicial District.  I would suggest to the [S]tate that Mr. Mackie not touch the case in any way.  If you think that would cause some difficulty with it, put up your Chinese Wall or whatever it's called and keep Mr. Mackie away from anything that would happen.  Nothing has happened at this point and so that motion to cause the District Attorney's [O]ffice to be recused from hearing the case is denied.

At the conclusion of the hearing, the trial court denied the motion to suppress, finding that the Defendant voluntarily waived his rights and provided the statement to the investigator.  The trial court also denied the motion for recusal, finding no reason for the D.A.'s Office to be recused from the case.

State's Proof

K.S. testified that she was eighteen years of age and a senior in high school. She said that she had been living in a foster home for two years. She identified her father, the Defendant, seated in the courtroom. She said that she lived with her father and mother on Sheep Bluff Road from the time she was born until she was removed and placed in foster care. She said that her brother, who was three years older than her, also lived there until he turned eighteen. She said that she lived in two different trailers on Sheep Bluff Road and that in 2012, when she was thirteen years old, her parents got rid of the first trailer and bought a new trailer.

K.S. identified a spreadsheet with a column containing a cell for years 2006 through 2016, and corresponding columns containing cells for her grade in school, her age, and the school she attended for each year. The spreadsheet also noted the date of "disclosure" as August 11, 2014. The spreadsheet, which was admitted as Exhibit 1 and published to the jury, provided:

DATE OF BIRTH: August 12, 1998

| YEAR | GRADE | AGE | SCHOOL | EVENTS |
|------|-------|-----|--------|--------|
| 2016 | Starting 12th | 18 | High School | |
| 2015 | Starting 11th | 17 | High School | |
| 2014 | Starting 10th | 16 | High School | Disclosure 8/11/14 |
| 2013 | Starting 9th | 15 | High School | |
| 2012 | Starting 8th | 14 | Middle School | |
| 2011 | Starting 7th | 13 | Middle School | |
| 2010 | Starting 6th | 12 | Middle School | |
| 2009 | Starting 5th | 11 | Middle School | |
| 2008 | Starting 4th | 10 | Elementary School | |
| 2007 | Starting 3th | 9 | Elementary School | |
| 2006 | Starting 2nd | 8 | Elementary School | |

K.S. testified that the Defendant "raped [her] from the age of eight until [she] was released to foster care." She said that he penetrated her vaginally with his penis and his fingers, that he penetrated her anally with his penis, and that they had oral sex. She estimated that he raped her at least twenty times and that the first rape occurred when she was eight years old, attending elementary school at Cane Creek School, and living in the "old trailer." The Defendant told her to come into his bedroom and lie down on the bed. K.S. said that she did what he told her to do "[bec]ause [she] trusted him." She said that

the Defendant covered her face with a towel and removed her shorts.  She asked "what was going on," and the Defendant told her "to trust him."  He then penetrated her vaginally with his penis.  She said the incident was painful and that she was crying.  She said that she did not tell anyone because she did not know who to trust.

K.S. said that her family moved into a new trailer in 2012 and that she "believed" she was thirteen years old when they moved into the new trailer.  She described an incident that occurred in the new trailer in which she was told to come into her parent's bedroom.  She said that her mother was lying on the bed, and the Defendant was sitting in a chair.  She said that they "asked [her] to lie down with them."  She said that she lay down beside her mother and that the Defendant got up from the chair, removed his shirt, and lay down on the other side of her mother.  She said that the Defendant took off her mother's nightgown and had sex with her mother.  She said that the Defendant took her shorts off and then penetrated her first with his fingers.  She said that she "was asking for them to stop and let me go[,]" but "he forced her to do the same thing with him as he was doing to her [mother]."  She explained that he forced her "to have sex with him" and that he penetrated her vaginally with his penis.  She said that she kept asking him to stop but that he would not.  She said that he told her "[j]ust not to tell anyone, not to say anything."  She said that she believed the incident involving her mother happened when she was thirteen or fourteen years of age in middle school.

K.S. recalled another incident in which the Defendant told her to come into his bedroom and sit down on his bed.  She said that he "asked [her] to turn over to lie on [her] stomach" on the edge of the bed.  She stated that the Defendant removed her shorts and penetrated her anally.  She said that she was crying because it hurt and that she asked him to stop and to leave her alone.  She stated that the Defendant stopped.  She did not tell anyone because she was scared and because she did not trust her mother.

The following dialogue is from the direct examination of K.S. concerning when the incident described above occurred:

> [State:]  That incident, [K.S.], where your dad put his penis in your bottom, where were you attending school at that time?
>
> [K.S.:]  I was in the middle school.
>
> [State:]  And the chart shows that you were thirteen or fourteen years old at that time, correct?
>
> [K.S.:]  Yes.

K.S. described another occasion when the Defendant came into her bedroom while she was sleeping.  She "remember[ed] being woken up to him taking [her] bed shorts off and . . . he continued to take his shorts off.  And he told [her] to be still, lie still as he would use his penis to put into [her] vagina."  The following dialogue from the direct examination concerned the above incident:

[State:]  Did that feel good?

[K.S.:]  No.

[State:]  Did you want it to occur?

[K.S.:]  No.

[State:]  This was at the new trailer, your bedroom, is that correct?

[K.S.:]  Yes.

[State:]  And what school were you attending at that time?

[K.S.:]  I believe it was middle school.

[State:]  So once again, you were thirteen/fourteen years old?

[K.S.:]  Yes.

[State:]  Did you say anything to him at that time?

[K.S.:]  I asked him to leave me alone.

[State:]  Did he leave you alone?

[K.S.:]  No.

K.S said that the last incident occurred during the summer before she was removed from her parents' custody on August 11, 2014.  She said that the Defendant came into the living room where she was sitting on the couch watching television.  During direct examination the following dialogue occurred:

[State:]  Tell me about that incident.

[K.S.:]  I was watching TV, it was late at, it was a night, at night. And I remember him coming in there and he asked me to sit beside him just to talk.  And then I remember him removing his shorts and removing mine and having me to lie down.  And then he would hold me while I was lying down and he would proceed to put his penis in my vagina.

[State:]  When you say he was holding you, where were his hands at?

[K.S.:]  They were on my legs.

[State:]  So you're l[]ying on your back, where are your arms at?

[K.S.:]  They're beside me.

[State:]  And his hands, both of his hands are physically holding your legs?

[K.S.:]  Yes.

[State:]  What was he doing with your legs, if anything?

[K.S.:]  He had them open.

[State:]  And he put his penis in your vagina?

[K.S.:]  Yes.

[State:]  Did he have a condom on?

[K.S.:]  No.

[State:]  Did he say anything to you?

[K.S.:]  He told me to be quiet.

[State:]  Did you scream?

[K.S.] Did not.

[State] Why did you not scream?

- 9 -

[K.S.:] I didn't feel like there was any use in it, didn't make any---

[State:] Was your mom in the trailer that night?

[K.S.:] She was.

[State:] Where was she at?

[K.S.:] She was in the room, in their room.

[State:] Was your brother there that night?

[K.S.:] He was not.

[State:] Did it feel good?

[K.S.:] No.

[State:] Did you want it to happen?

[K.S.:] No.

[State:] Did you tell him anything?

[K.S.:] I asked him to stop.

[State:] Did he stop?

[K.S.:] No.

K.S. stated that she never consented to any of the incidents. She said that she initially tried "to fight him off" but was unable to do so and that the Defendant told her not to tell anyone and threatened to kill himself if she did. She stated that the Defendant never wore a condom and told her that if she became pregnant he would blame it on whoever she was with at the time. She said that the first person she told was her boyfriend and that he talked to his aunt. She and her boyfriend then discussed the events with two friends. One of her friends told their mother, and her friend's mother came to school on August 11, 2014, talked to K.S., and convinced her to talk to the vice-principal.

Investigator Hembree testified that he was currently in charge of the detective division for the PCSD. After receiving a telephone call from Detective Cooper asking for his assistance, he drove to Cookeville High School where he met the Defendant and his wife. He asked the Defendant to come with him to the D.A.'s Office for an interview. He explained that the D.A.'s Office had an interview room equipped with audio and video recording equipment.

The approximately one-hour long audio/video of the interview of the Defendant was entered as an exhibit and played for the jury. The interview began with Investigator Hembree advising the Defendant that he was not under arrest and obtaining the Defendant's consent to the interview. Investigator Hembree then read an Advice of Rights Form containing *Miranda* warnings and obtained the oral and written waiver of those rights from the Defendant. The Defendant initially denied any inappropriate contact with K.S. The Defendant later admitted that he had sexual contact with K.S. approximately twenty times, including digital- and penile-vaginal penetration and oral sex. He admitted to the incident in his bedroom involving his wife and K.S. He claimed that the sexual contact with K.S. was consensual.

Detective Cooper testified that he was assigned to the "crimes against children" division of the PCSD. He said that on August 11, 2014, at approximately 1:00 p.m., he received a call from the DCS Supervisor advising him of K.S.'s allegations. He immediately went to Cookeville High School. He contacted the Child Advocacy Center and requested that they bring their mobile unit, which is used to interview victims, to the school so that he could interview K.S. He next requested deputies to go to the Defendant's home to see if anyone was there and to secure the scene so that no one could enter or exit the home. He said that no one was at the residence. During the time Investigator Hembree was conducting the interview of the Defendant, Detective Cooper obtained a search warrant for the Defendant's residence. After the interview, the Defendant was transported to the high school to pick up his vehicle. He drove to the residence where he and his wife consented to a search of the residence and provided saliva by buccal swabs. Officers seized sheets from the Defendant's bed and K.S.'s bed and fabric samples from the couch cushions.

Tennessee Bureau of Investigation Special Agent Mark Dunlap testified as an expert in forensic science. He opined that the DNA profile from spermatozoa on the fabric sample from the couch was a match to the Defendant's DNA.

<u>Election of Offenses</u>

At the conclusion of the State's proof, the State made an election of offenses, electing to proceed on the following counts: Count 1, "penetration of [K.S.]'s vagina by

the [D]efendant's penis for the first time when she was eight years old"; Count 4 (renumbered Count 2), "penetration of [K.S.]'s vagina by the [D]efendant's penis in the [D]efendant's bedroom when [the Defendant's wife] was present and [K.S.] was thirteen or fourteen years old in middle school"; Count 5 (renumbered Count 3), "penetration of [K.S.]'s anus by the [D]efendant's penis when she was thirteen or fourteen years old in middle school"; Count 6 (renumbered Count 4), "penetration of [K.S.]'s vagina by the [D]efendant's penis while she was in her bedroom when she was thirteen or fourteen years old in middle school"; and Count 7, "penetration of [K.S.]'s vagina by the [D]efendant's penis for the final time when she was fifteen years old[.]"

Defendant's Proof

After the trial court denied the Defendant's motion for judgment of acquittal, the defense presented two witnesses.

T.S., K.S.'s brother, testified that he was four years and four months older than K.S. and that he and K.S. had shared a bedroom until they bought a new trailer near the time of his eighteenth birthday. He stated that he was home most of the time when he was not in school until he turned seventeen and started working after school. He said that K.S. never told him "anything was happening between her father and her" and that he never suspected anything was going on before K.S. made the allegations.

The Defendant testified that he had sexual relations with K.S. that began when she was thirteen years old. He stated that he never used force or coercion or used his parental authority to accomplish sexual activity with his daughter. He also stated that he had sexual contact with his daughter while his wife was present.

On cross-examination, the Defendant admitted to having sex with his daughter approximately twenty to thirty times from the date she turned thirteen until she was removed from his custody. He denied having sex with her when she was eight years old and denied ever using force to accomplish a sexual act. He said, "It was her choice." The following dialogue is from the State's cross-examination of the Defendant:

> [State:] But you're saying she approached you about having sex with you being thirteen years old?
>
> [The Defendant:] I said she wanted it, she wanted me to.
>
> [State:] Your daughter being thirteen years old came to you and said, hey Dad, by the way, I'm feeling pretty frisky today, let's have sex?

- 12 -

[The Defendant:]  She has said that, yes.  Maybe not in them words, but yes, she has come to me---

[State:]  The first time she came to you at thirteen years old and said, hey Dad, let's go back to your bedroom and have sex?

[The Defendant:]  Actually, I, we fooled around for a while, touching and stuff, and she kept wanting me to and I kept telling her no, that she needed to wait.

[State:]  You told [K.S.] no and she kept pushing you?

[The Defendant:] She kept wanting to, wanting to go all the way.

[State:]  At thirteen years old?

[The Defendant:]  Yes, Ma'am.

[State:]  She's the one who initiated the contact?

[The Defendant:]  She kept wanting me to go all the way.  I kept telling her no.

[State:]  Just out of the blue, your thirteen[-]year[-]old daughter---

[The Defendant:]  I told you the[re] was touching and stuff involved.

[State:]  My question is this, your thirteen[-]year[-]old daughter came to you one day out of the blue and said, hey Dad, let's go back to your bedroom and let's just start touching each other sexually?

[The Defendant:]  No, Ma'am.

[State:]  So she had to learn that behavior from somebody and that somebody was you, isn't that right?

[The Defendant:]  No, Ma'am.

<u>Jury Verdict and Sentence</u>

The jury found the Defendant guilty of rape of a child in Count 1 and guilty of rape in Counts 2, 3, 4, and 5.[5]  Following a sentencing hearing, the trial court sentenced the Defendant to twenty-five years for rape of a child and to twelve years for each count of rape.  The four twelve-year sentences were ordered to be served concurrently with each other but consecutively to the mandatory twenty-five-year sentence.  After his motion for new trial was denied, the Defendant timely filed this appeal.

**Analysis**

In this appeal, the Defendant claims that: (1) the trial court erred in denying his motion to suppress his statement; (2) the trial court erred in denying his motion for recusal of the District Attorney General and his staff; (3) the trial court abused its discretion in ordering his four concurrent twelve-year sentences to be served consecutively to his twenty-five-year sentence; and (4) the evidence introduced at trial was insufficient to convict the Defendant.  The State argues that the trial court properly denied the motion to suppress and motion for disqualification, that the trial court properly sentenced the Defendant, and that the evidence was sufficient to support the convictions.  We agree with the State.

*Motion to Suppress*

The Defendant claims that the actions of Investigator Hembree "during the investigation were coercive enough to render the [D]efendant's statement involuntary."  Specifically, the Defendant claims that Investigator Hembree would not allow the Defendant to see K.S. nor would he tell the Defendant where K.S. had been taken after school.  The Defendant claims that Investigator Hembree told the Defendant "repeatedly that his daughter was in the dark, and that she needed her father's help[.]"

When reviewing a motion to suppress, this court is bound by the trial court's findings of fact unless the evidence preponderates otherwise. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996).  Questions of credibility, the weight and value of the evidence and resolutions of conflicts in the evidence are resolved by the trial court.  *Id.*  The prevailing party is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom.  *Id.*  We review the trial court's conclusions of law de novo.  *State v. Carter*, 160 S.W.3d 526, 531 (Tenn. 2005).  In evaluating the

---

[5] These count numbers are from the superseding indictment prepared in regard to the State's election of offenses.  The counts correspond to Counts 1, 4, 5, 6, and 7 of previous superseding indictment.

correctness of a trial court's ruling on a pretrial motion to suppress, this court may consider the proof adduced both at the suppression hearing and at trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

The Fifth Amendment to the United States Constitution provides in pertinent part that "no person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, the Tennessee Constitution states that "in all criminal prosecutions, the accused shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. The test of voluntariness for confessions under the Tennessee Constitution is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment. *State v. Crump*, 834 S.W.2d 265, 268 (Tenn. 1992).

The voluntariness of a confession is a question of fact. *State v. Sanders*, 452 S.W.3d 300, 306 (Tenn. 2014). The State has the burden of proving the voluntariness of a confession by a preponderance of the evidence. *Id.* In evaluating whether a statement was given voluntarily, "the essential inquiry . . . is whether a suspect's will was overborne so as to render the confession a product of coercion." *State v. Climer*, 400 S.W.3d 537, 568 (Tenn. 2013) (citing *Dickerson v. United States*, 530 U.S. 428, 433-35, (2000)). A suspect's subjective perception alone is insufficient to support a conclusion of involuntariness of a confession. *See id.* (trial court must examine the totality of the circumstances when determining voluntariness of a confession). Rather, "coercive police activity is a necessary predicate to finding that a confession is not voluntary[.]" *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994) (citing *Colorado v. Connelly*, 479 U.S. 157, 164 (1986)).

In Tennessee, a court determining voluntariness must examine the totality of the circumstances surrounding the giving of a confession, including "both the characteristics of the accused and the details of the interrogation." *Climer*, 400 S.W.3d at 568 (quoting *Dickerson*, 530 U.S. at 434) (internal quotation mark omitted). Factors relevant to "the characteristics of the accused" include "the [accused]'s sobriety, education, intelligence level, and experience with the law," *State v. Northern*, 262 S.W.3d 741, 764 (Tenn. 2008); and the accused's physical and mental health. *State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996). Factors relevant to the "the details of the confession" include the manner and length of the questioning, the length of the detention of an accused before the statement was given, and failure to advise an accused of his or her rights. *Northern*, 262 S.W.3d at 764.

The Defendant and his wife were at Cookeville High School when Investigator Hembree arrived at approximately 6:00 p.m. After advising the Defendant that he was

not under arrest, the Defendant agreed to ride with a police officer to the D.A.'s Office for an interview. The Defendant was not handcuffed during the trip to the D.A.'s Office.

The entire interview was recorded and the audio/video compact disk was entered as an exhibit. At the beginning of the interview, Investigator Hembree again advised the Defendant that he was not under arrest. He explained that he asked the Defendant to ride with an officer rather than drive in his own vehicle for safety reasons because the Defendant had a gun permit. Investigator Hembree then explained the purpose of the Advice of Rights/Waiver of Rights form and read the text of the form to the Defendant. The Defendant stated that he understood his rights, had no questions, and signed the form at 8:11 p.m. The line immediately before his signature states:

> This WAIVER of my RIGHTS has been KNOWINGLY and VOLUNTARILY made by me without any promises or threat having been made to me and further without any pressure or coercion having been used against me.

At no time during the approximately hour-long interview did Investigator Hembree raise his voice or become hostile towards the Defendant. Although Investigator Hembree talked generally about what K.S. had told him, he did not do so in a coercive, threatening, or abusive manner. The Defendant appeared calm throughout the interview and never asked to stop the interview or to talk to an attorney. The Defendant appeared to have no physical difficulty sitting through the interview or mental difficulty in understanding and answering the questions. The time between Investigator Hembree's first contact with the Defendant at Cookeville High School and the conclusion of the interview was not excessively long. There was no proof that the law enforcement officers involved in investigating the case and in obtaining the Defendant's statement acted coercively.

The trial court's finding that the Defendant voluntarily waived his rights and provided the statement to Investigator Hembree is fully supported by the proof. The trial court properly denied the motion to suppress the statement, and the Defendant is not entitled to relief on this issue.

*Motion to Disqualify the D.A.'s Office*

The Defendant argues that the trial court should have granted his motion to disqualify the District Attorney General and his staff because an attorney who previously represented the Defendant in another county in a matter involving a different daughter was now employed as an assistant district attorney.

- 16 -

Rule 8, Rules of Professional Conduct 1.10 of the Rules of the Supreme Court provides the general rule governing conflicts of interest:

> (a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by RPCs 1.7, 1.9 or 2.2, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.

Tenn. Sup. Ct. R. 8, RPC 1.10(a). The term "firm" includes law departments of an organization or government agency, such as the lawyers employed by a district attorney general's office. Tenn. Sup. Ct. R. 8, RPC 1.0(c), cmts. 2, 3; *see State v. Jason Clinard*, No. M2007-00406-CCA-R3-CD, 2008 WL 4170272, at *4 (Tenn. Crim. App. Sept. 9, 2008) (applying RPC 1.10(c) to the district attorney general's office), *no perm. app. filed*.

The Rules of Professional Conduct provide that lawyers in a firm may avoid disqualification based on a conflict of interest of a "personally disqualified lawyer" if certain action is taken by the firm. Tenn. Sup. Ct. R. 8, RPC 1.10(c). A firm may avoid disqualification by taking steps to: (1) ensure that the "disqualified lawyer is prohibited from participating in the representation of the current client;" (2) ensure that no "information from the personally disqualified lawyer that is material to the current matter" is disclosed; (3) "promptly implement screening procedures to effectively prevent the flow of information about the matter between the personally disqualified lawyer and the other lawyers in the firm;" and (4) "advise the former client in writing of the circumstances that warranted the implementation of the screening procedures . . . and the actions that have been taken to comply with this Rule." Tenn. Sup. Ct. R. 8, RPC 1.10(c)(1-4).

Imputed disqualification of the firm cannot be avoided under RPC 1.10(c), if:

> (1) the disqualified lawyer was substantially involved in the representation of a former client; and

> (2) the lawyer's representation of the former client was in connection with an adjudicative proceeding that is directly adverse to the interests of a current client of the firm; and

> (3) the proceeding between the firm's current client and the lawyer's former client is still pending at the time the lawyer changes firms.

Tenn. Sup. Ct. R. 8, RPC 1.10 (d)(1-3).

"In determining whether to disqualify an attorney in a criminal case, the trial court must first determine whether the party questioning the propriety of the representation met its burden of showing that there is an actual conflict of interest." *State v. White*, 114 S.W.3d 469, 476 (Tenn. 2003). However, even if the party questioning the propriety of the representation fails to prove that there is an actual conflict of interest, disqualification can also be based on the appearance of impropriety. *State v. Culbreath*, 30 S.W.3d 309, 313 (Tenn. 2000). However, where a criminal defense attorney switches adversarial sides, "the appearance of impropriety is not the central concern. Primarily, it is a matter of an unacceptable risk of harm or disclosure which is at issue." *State v. Coulter*, 67 S.W.3d 3, 32-33 (Tenn. Crim. App. 2001) (quoting *State v. Willie Claybrook*, No. 3, 1992 WL 17546, at *8 (Tenn. Crim. App. Feb. 5, 1992)), *abrogated on other grounds by State v. Jackson*, 173 S.W.3d 401, 407 n.3 (Tenn. 2005). On appeal, the trial court's decision on disqualifying an attorney will not be reversed absent an abuse of discretion. *White*, 114 S.W.3d at 475.

In *Jason Clinard*, an attorney who was employed by the public defender's office while the defendant was represented by that office obtained employment with the office of the district attorney general during the pendency of the defendant's case. *Jason Clinard*, 2008 WL 4170272, at *4. The defendant moved to disqualify the district attorney general and his staff. *Id*. The trial court disqualified the individual assistant district attorney previously employed by the public defender but, after finding "the district attorney's office had implemented adequate screening procedures to ensure" that the prior public defender "would have no contact with the prosecution of the defendant's case," denied the request to disqualify the district attorney's office. *Id*. at *5. This court determined that, "[b]ecause the defendant . . . failed to present any evidence of a conflict of interest requiring disqualification beyond that of the individual prosecutor, he is not entitled to relief." *Id.* at *4.

The totality of the proof concerning disqualification was the vague testimony of Barbara Sisco, the Defendant's mother, which was solicited by trial counsel at the November 19, 2015 motion hearing. In summary, the Defendant's mother testified that she thought that the Defendant retained Mr. Mackie to represent him in a DCS matter regarding a different daughter in Cumberland County. She stated that she "d[id]n't remember that much about the case." The Defendant failed to meet his burden to show an actual conflict of interest or a risk of harm or disclosure of information that might aid the State in its prosecution. Nevertheless, the trial court took appropriate action to disqualify Mr. Mackie from participating in this case to avoid the appearance of impropriety. *See State v. Davis*, 141 S.W.3d 600, 613 (Tenn. 2004) (citing *Culbreath*, 30 S.W.3d at 313) ("Even if there was no actual conflict of interest, disqualification could

also be based on the appearance of impropriety."). Through questioning of the State, the trial court took additional steps to assure that Mr. Mackie had not been and would not be involved in the case. The trial court instructed the State to implement screening procedures to reasonably ensure that any information derived from Mr. Mackie's prior representation of the Defendant would not be disclosed to the State. These steps were adequate to avoid disqualification of the District Attorney General and his staff. *See* Tenn. Sup. Ct. R. 8, RPC 1.10(c)(1-4).

Additionally, the Defendant failed to prove that Mr. Mackie's representation of him in the Cumberland County DCS case "was in connection with an adjudicative proceeding that [was] directly adverse to the interests" of the State or that the DCS matter was "still pending[.]" *See* Tenn. Sup. Ct. R. 8, RPC 1.10 (d)(2)-(3). Therefore, the Defendant has failed to show that the State was prohibited from using the procedure outlined in Rule 8, RPC 1.10(c) to "avoid imputed disqualification" of the D.A.'s Office. *See* Tenn. Sup. Ct. R. 8, RPC 1.10(d).

The Defendant failed to present any evidence of a conflict of interest requiring disqualification beyond that of Mr. Mackie. The trial court did not abuse its discretion in refusing to disqualify the District Attorney General and the remainder of his staff.

*Sentencing*

The Defendant claims that the trial court abused its discretion in ordering his four concurrent twelve-year sentences for rape to be served consecutively to his twenty-five-year sentence for rape of a child. After the jury returned its verdict, the trial court set the sentencing hearing for November 18, 2016. Although two exhibits filed on November 18, the "Pre-Sentence Report" and a "Psychosexual Evaluation," are included in the record before this court, the transcript of the sentencing hearing is not. "Where the record is incomplete and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which the party relies, an appellate court is precluded from considering the issue." *State v. Ballard*, 855 S.W.2d 557, 560-61 (Tenn. 1993). Tennessee Court of Criminal Appeals Rule 10 provides that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. 10(b). We conclude that the record of the sentencing phase is inadequate and, therefore, this issue is waived. *See* Tenn. R. App. P. 24(b) ("[T]he appellant shall have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal.").

*Sufficiency of the Evidence*

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

### Sufficiency of the Evidence of Rape of a Child

The Defendant claims that the evidence was insufficient to convict him of rape of a child. "Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by the victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" T.C.A. § 39-13-501(7) (2006).

In his brief, the Defendant argues, without citation to authority, that "the accusation made by the alleged victim, absent any corroborating proof, is not enough to sustain a conviction for rape of a child." The Defendant's assertion is simply not a correct statement of the law. Although a defendant cannot be convicted "solely upon the uncorroborated testimony of an accomplice," *State v. Shaw*, 37 S.W.3d 900, 903 (Tenn. 2001), K.S. was not and could not legally be an accomplice. *State v. Collier*, 411 S.W.3d 886, 899-900 (Tenn. 2013) (victims of statutory rape do not qualify as accomplices). A defendant can be convicted on the uncorroborated testimony of a child victim. *Id.*; *State*

*v. Troy Love*, No. E2015-02297-CCA-R3-CD, 2017 WL 1077062, at *15 (Tenn. Crim. App. Mar. 21, 2017), *perm. app. denied* (Tenn. July 20, 2017).

It was for the jury in this case to determine the credibility of the witnesses, to reconcile any conflicts in the testimony of witnesses, if it could; and to weigh and value the testimony of the witnesses. *State v. Finch*, 465 S.W.3d 584, 597 (Tenn. Crim. App. 2013) (citing *Bland*, 958 S.W.2d at 659). The jury decides which witnesses they believe and the value of each witness's testimony.

In this case, K.S. testified that her father penetrated her vaginally with his penis when she was eight years of age, attending elementary school at Cane Creek School and living in the "old trailer." Based on its verdict, the jury accepted her testimony that the Defendant sexually penetrated her when she was under the age of thirteen and rejected the testimony of the Defendant that the victim was over thirteen years of age when he had sexual intercourse with his daughter. The evidence was sufficient to support the conviction of rape of a child.

<u>Sufficiency of the Evidence of Rape</u>

The Defendant argues that the "statements made by the [D]efendant . . . , the testimony of [K.S.], and the investigators, along with only the TBI lab report is not sufficient upon which to base a conviction [of rape]."

Tennessee Code Annotated defines rape as the "unlawful sexual penetration of a victim by the defendant or of the defendant by a victim accompanied by any of the following circumstances[.]" Tenn. Code Ann. § 39-13-503(a) (2011). Counts 2, 3, and 4 alleged the first circumstance: "(1) Force or coercion is used to accomplish the act[.]" Tenn. Code Ann. § 39-13-503(a)(1) (2011). The definition of coercion as applicable to Tennessee Code Annotated section 39-13-503(a)(1) is defined as follows:

> "Coercion" means threat of kidnapping, extortion, force or violence to be performed immediately or in the future or the use of parental, custodial, or official authority over a child less than fifteen (15) years of age[.]

Tenn. Code Ann. § 39-13-501(1) (2011). Counts 2, 3, and 4 alleged that the Defendant sexually penetrated K.S. between August 12, 2011, the day K.S. turned thirteen, and August 11, 2013, the day before K.S. turned fifteen.

Count 5 alleged the second circumstance: "(2) The sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to

know at the time of the penetration that the victim did not consent." Tenn. Code Ann. § 39-13-503(a)(2) (2011). Count 5 alleged that the Defendant sexually penetrated K.S. between August 12, 2013, the day K.S. turned fifteen, and August 31, 2014, shortly after K.S. turned sixteen.

Initially, we note that the Defendant admitted to having sexual relations with K.S. involving some form of penetration on twenty or thirty occasions from the time she turned thirteen until she was removed from his home one day before her sixteenth birthday. We also note that K.S. stated she never consented to any of the incidents, that she initially tried "to fight him off" but was unable to do so, and that the Defendant told her not to tell anyone and threatened to kill himself. Therefore, the "pivotal issue for the jury" in Counts 2, 3, and 4 was whether or not the Defendant used force or coercion to sexually penetrate his daughter. *State v. Michael Elvis Green*, No. W2001-00455-CCA-R3-CD, 2002 WL 1482680, at *3 (Tenn. Crim. App. Mar. 8, 2002), *perm. app. denied* (Tenn. Sept. 23, 2003). For Count 5, the "pivotal issue" was whether or not the sexual penetration was "accomplished without the consent of [K.S.] and the [D]efendant kn[ew] or has reason to know at the time of the penetration that [K.S.] did not consent." *Id.*; Tenn. Code Ann. § 39-13-503(a)(2) (2011).

## Count 2

K.S. described an incident in the new trailer that occurred when she was thirteen or fourteen years old and in middle school in which the Defendant digitally penetrated her and then penetrated her with his fingers and penis after he had sexual intercourse with K.S.'s mother in the same bed. She said that she "was asking for them to stop and let [her] go" but "he forced her to do the same thing with him as he was doing to her [mother]." She explained that he forced her "to have sex with him" and that he penetrated her vaginally with his penis. She said that she kept asking him to stop but that he refused. She said that he told her "[j]ust not to tell anyone, not to say anything."

The jury was free to believe K.S. and to disbelieve the Defendant. *Finch*, 465 S.W.3d at 597. This court does not have the authority to re-weigh the evidence that was presented to the jury. The proof was sufficient for the jury to determine that the Defendant used force or coercion to sexually penetrate K.S. when she was thirteen or fourteen years old. The evidence is sufficient to support the jury's verdict in Count 2.

## Count 3

K.S. testified that, when she was thirteen or fourteen years of age and in middle school, the Defendant penetrated her anally. The Defendant told her to come into his bedroom and sit down on his bed. She said that he "asked [her] to turn over to lie on

- 22 -

[her] stomach" on the edge of the bed. She said that she was crying because it hurt and that she asked him to stop and to leave her alone. She stated that the Defendant stopped. The proof was sufficient for the jury to determine that the Defendant used force or coercion through his parental authority to sexually penetrate K.S. after she turned thirteen years old but before she became fifteen years old. The evidence is sufficient to support the jury's verdict in Count 3.

### *Count 4*

K.S. stated that on another occasion when she was thirteen or fourteen years of age and in middle school, the Defendant came into her room. She awoke to find the Defendant removing her shorts. He then penetrated her vaginally with his penis. She testified that it did not feel good, that she did not want it to occur, and that she asked the Defendant to leave her alone but he refused. The proof was sufficient for the jury to determine that the Defendant used force or coercion through his parental authority to sexually penetrate K.S. after she turned thirteen years old but before she became fifteen years old. The evidence is sufficient to support the jury's verdict in Count 4.

### *Count 5*

The Defendant was charged in Count 5 with rape that occurred on or after August 12, 2013, and on or before August 31, 2014. This time interval begins when K.S. turned fifteen and ends shortly after her sixteenth birthday. She said that the Defendant came into the living room where she was sitting on the couch watching television. He removed his shorts and removed K.S.'s shorts, physically held her down, and then sexually penetrated her. She said that it did not feel good, that she did not want it to happen, and that she asked the Defendant to stop, but he did not. The Defendant told her to be quiet. The proof was sufficient for the jury to determine that the sexual penetration was accomplished by the Defendant without the consent of K.S. and that the Defendant knew or had reason to know at the time of the penetration that K.S. did not consent. The evidence is sufficient to support the jury's verdict in Count 5.

### Conclusion

We affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 23 -